UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                                      :
LOGFRET, INC.,                                                        :
                                                                      :
                               Plaintiff,                             :
                                                                      :                    20 Civ. 7142 (JPC)
                -v-                                                   :
                                                                      :                    OPINION
GERBER FINANCE, INC.                                                  :                    AND ORDER
                                                                      :
                               Defendant.                             :
                                                                      :
----------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

        Logfret, Inc. ("Logfret") brought this diversity action against Gerber Finance, Inc.

("Gerber") alleging various state law claims stemming from a dispute over a loan agreement

between the two parties.  Specifically, Logfret seeks a declaratory judgment that certain fees Gerber

charged Logfret were usurious or arose from unenforceable provisions of the loan agreement.

Logfret also alleges breach of contract, breach of the implied covenant of good faith and fair

dealing, breach of fiduciary duty, tortious interference with current and prospective economic

relations, fraud in the inducement, misrepresentation, and promissory estoppel, as well as demands

an accounting of all fees charged and a recission of the loan agreement.

        Before the Court is Gerber's motion to dismiss pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  For the reasons stated below, the Court grants Gerber's motion.  The

Court dismisses all of Logfret's claims with prejudice, except for a portion of its breach of contract

claim, which is dismissed without prejudice.

## I.  Background

### A.  Factual Background

The following factual allegations are taken from the Complaint, Dkt. 1 ("Complaint" or "Compl.") and the documents attached to it as exhibits, including the loan agreement between Logfret and Gerber, Dkt. 1-2 (the "Loan Agreement").  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  In the present posture, the Court "accept[s] as true the factual allegations in the complaint and draw[s] all inferences in the plaintiff's favor."  *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

#### 1.  The Loan Agreement

Logfret is a "global transportation logistics company," incorporated in Delaware with its principal place of business in New Jersey.  Compl. ¶ 5.  Gerber is a New York corporation with its principal place of business in New York.  *Id.* ¶ 6.  Gerber serves as a "lender that specializes in asset-based lines of credit and provides working capital for its customers by leveraging its customers' accounts receivables, inventory, and real estate assets."  *Id.*  On September 26, 2019, Gerber issued a letter of intent to provide an asset-based credit facility to Logfret.  *Id.* ¶ 10.  The parties negotiated for three months until they eventually entered into the Loan Agreement on December 31, 2019.  *Id.* ¶¶ 12, 15.  Logfret's parent company, Logistique Holding ("Logistique"), provided a guaranty to Gerber as to the Loan Agreement.  *Id.* ¶ 39.

Logfret and Gerber were each "advised by counsel of its choices and decisions with respect to th[e] [Loan] Agreement."  Loan Agreement § 12.3.  The Loan Agreement, including its attachments, schedules, and other exhibits, is 104 pages.  Put simply, it provided that Gerber would give Logfret "revolving loan advances" through a $3 million credit line.  Compl. ¶ 12.  The loan advances were secured by "specific items of collateral provided by Logfret."  *Id.*  Logfret was

required to deposit the collateral—which included all of Logfret's property and assets, including accounts receivable—into an account under Gerber's name and control.  *See* Loan Agreement § 10.1(a), Schedule IV; *see also* Compl. ¶ 52.  Logfret's customers were required to pay amounts they owed Logfret directly into this collateral account, or, if they did not, Logfret had to "immediately" deposit the funds they received into the account.  Compl. ¶ 52 (internal quotation marks omitted); *see also* Loan Agreement, Schedule IV.  If Logfret did not do this, Gerber could charge Logfret a diversion fee.  Compl. ¶¶ 52-54.  The Loan Agreement outlined the maximum amount that Logfret could borrow at any given time, which was calculated based on the amount of collateral Logfret had in the collateral account.  *See Id.* ¶¶ 16-17.  If Logfret borrowed more than the maximum, the Loan Agreement subjected Logfret to an over-advance fee.  Loan Agreement § 5.1(b)(vi); *see also* Compl. ¶ 18.

Shortly before finalizing the deal, Logfret explained to Gerber that it sought to immediately borrow more than $2.7 million to refinance a loan with a prior lender.  *See* Compl. ¶¶ 15, 17.  Gerber told Logfret that this amount may exceed the maximum amount that Logfret could borrow.  *See id.* ¶ 17.  But Logfret says that Gerber made "various affirmative representations" that made clear that Logfret could borrow this amount without triggering any over-advance fees outlined in the Loan Agreement.  *Id.* ¶ 18; *accord id.* ¶¶ 20 (alleging that Gerber "provided assurances that the [initial loan advance] would not put Logfret in an over-advance position"); 21 (alleging that Gerber representatives "made various and specific representations and assurances to Logfret that Gerber would work with Logfret in good faith so as to assist Logfret in avoiding the imposition of any fees").

For example, on November 22, 2019, Elena Goynatsky, Senior Vice President of Gerber, told Logfret in an e-mail that Gerber would give Logfret 90 days after closing to provide additional

collateral before over-advance fees would be imposed. *Id.* ¶ 22; *see id.*, Exh. C. Gerber also stated that it would be "flexible" with various requirements set forth in the Loan Agreement. *Id.* ¶ 24. Goynatsky and others at Gerber further told Logfret that it often worked with its customers "in connection with the transitioning process of a new loan" and that Gerber would follow this same "course of practice and dealing" with Logfret. *Id.* ¶ 25 (internal quotation marks omitted). Moreover, Gerber's website stated that Gerber "look[s] past the collateral to ensure entrepreneurs have the right partner to maximize their full potential" and emphasized that Gerber's "flexibility, care and tailored structure make [Gerber] the right financing partner for companies experiencing accelerated growth or with seasonality in their business." *Id.* ¶ 26. According to Logfret, all of these representations were "material and significant" in Logfret's decision to partner with Gerber. *Id.* ¶ 27.

### 2. Over-Advance Fees and Diversion Fees

After the deal closed on December 31, 2019, Gerber provided Logfret a $2,746,930.42 loan so that Logfret could refinance its loan with its prior lender. *Id.* ¶ 15. Immediately following this, Gerber charged Logfret an over-advance fee of $35,358.98. *Id.* ¶ 16. Logfret alleges this was "in direct contravention of . . . representations, agreements, and reassurances" that Gerber had made to Logfret. *Id.* ¶ 29. On February 1, 2020, Gerber charged Logfret a second over-advance fee of $27,521.17 and deducted this amount from Logfret's collateral account. *Id.* That day, Gerber also charged Logfret an diversion fee of $63,175.52 and subtracted this amount from the collateral account too. *Id.* Thus within 30 days of the Loan Agreement's closing, Gerber charged Logfret more than $125,000 in fees and used Logfret's collateral account to pay for those fees. *Id.* ¶ 30.

Logfret recognizes that the over-advance fee and diversion fee were outlined in the Loan Agreement. *See id.* ¶ 66; *see also* Loan Agreement § 5.1(b)(vi), Schedule IV. But, as for the

diversion fee, Logfret points to the fact that it was not listed in the "Interest and Fees" section of the Loan Agreement, *see* Loan Agreement § 5.1, but instead was only "referenced in a single sentence of one of the many schedules of the [Loan] Agreement and [was] mentioned in just one line of the entirety of the close to one hundred page Agreement." Compl. ¶ 50. Nor was it mentioned in the letter of intent or during negotiations with Gerber. *Id.* ¶ 51.

Logfret says it did not know that Gerber charged it any of these fees until February 2020 when it gained access to a portal that managed the Loan Agreement. *Id.* ¶ 31. At that point, Logfret attempted to provide "the necessary [c]ollateral documentation" in order to avoid further fees. *Id.* ¶ 32. Logfret also confronted Gerber, explaining that the fees and penalties were "inconsistent with the representations, agreements, and reassurances that Gerber's representatives had made to Logfret." *Id.*

Gerber told Logfret that the only way to avoid additional fees and penalties would be to reduce its loan balance by $1.5 million. *Id.* ¶ 33. On January 27, 2020, Logistique paid Gerber $500,000 to reduce the outstanding loan amount. *Id.* ¶ 34.[1] On February 14, 2020, Logistique paid Gerber another $1 million toward the loan balance. *Id.* Logfret says that "this $1,500,000.00 infusion was never part of the [c]ollateral that was required to be provided by Logfret under the [Loan] Agreement." *Id.* ¶ 35. After Logistique had reduced the loan balance by $1.5 million, Gerber told Logfret that the problems causing the imposition of fees and penalties had been fixed, and the fees and penalty amounts themselves would be credited "back to Logfret on the [l]oan balance." *Id.* ¶ 36. But Gerber continued to assess fees. *Id.* ¶ 37. Logfret again contacted Gerber, and Goynatsky and others at Gerber "made renewed representations and again provided

---

[1] Logfret does not explain why its parent company would have made this payment in January 2020 if Logfret did not learn about the imposition of fees until it gained access to the portal in February 2020. *Compare* Compl. ¶ 34 *with id.* ¶ 31.

reassurances that Gerber would work with Logfret to resolve the fees and penalties issues." *Id.* ¶ 38.

In February 2020, apparently in an effort to further pad its collateral account and avoid additional fees, Logfret delivered to Gerber a mortgage on "various real estate that had a combined market value of $3,600,000." *Id.* ¶ 39. Several months later, Logfret "was notified that due to a signatory error the mortgage was not filed." *Id.* ¶ 40. Logfret says that Gerber's lien on the property was fully insured by an insurance policy, implying that the signatory error should not have affected whether the mortgage could count toward Logfret's collateral. *Id.* Therefore, Logfret alleges that Gerber was "adequately collateralized for the [l]oan," seemingly relying on the $1.5 million infusion from Logistique and the $3.6 million mortgage. *Id.* ¶ 41; *see also id.* ¶ 39. As for other forms of collateral, Logfret contends that Gerber improperly determined that certain Logfret invoices could not count toward Logfret's collateral (*i.e.*, as accounts receivable). *Id.* ¶ 47. According to Logfret, these invoices should have qualified as collateral the moment that Logfret sent them to its customers, but Gerber did not count them as such until the goods that were the subject of the invoices arrived at their respective ports of delivery. *Id.* Despite Logfret's efforts to collateralize its loan, on March 1, 2020, Gerber charged Logfret a third over-advance fee of $39,926.80, and another diversion fee of $282,612.11. *Id.* ¶ 42. Additional fees were again assessed in April 2020. *Id.* ¶ 45.

### 3. Customs Fees

Logfret also says that there was a problem with how Gerber treated certain funds that Logfret's customers gave Logfret to pay customs fees. Many of Logfret's customers shipped goods into the United States from overseas. *See id.* ¶¶ 55-56. Some of these customers arranged for Logfret to pay their customs duty fees, which must be paid before goods can be released from a

port of delivery.  *Id.* ¶ 56.  Logfret says that such prepaid customs fees were not defined as collateral under the Loan Agreement.  *Id.*  Still, it seems that these funds were deposited into the collateral account.  *See id.*

On August 19, 2020, Logfret requested a second loan advance on top of the one it took immediately after the Loan Agreement closed.  *Id.* ¶ 57.  This request was for more than $1,000,000 so that it could pay certain customs fees on behalf of its customers.  *Id.*  In other words, Logfret seems to have wanted to access the funds earmarked for customs fees that were sitting in the collateral account.  The next day, Gerber denied Logfret's request and refused to release from the collateral account the funds needed to pay the customs fees.  *Id.* ¶ 58.  Logistique came the rescue again and paid the customs fees on behalf of Logfret.  *Id.*  ¶¶ 58-59.  If it had not done so, the cargo apparently would not have been able to leave the ports to be transported by Logfret.  *Id.* ¶ 59.  Because of Gerber's refusal to allow Logfret to access customs fees deposited into the collateral account, in effect, Gerber used these fees to pay the over-advance fees and diversion fees that it assessed on Logfret.  *Id.* ¶ 61.

### 4. Default

On August 24, 2020, Gerber issued Logfret a notice of default, which accelerated the loan balance and demanded a pay-off of the loan.  *Id.* ¶ 62.  Logistique then gave Logfret an additional $400,000 "so that Logfret could continue to stay in business and operate."  *Id.* ¶ 63.  Eventually, Gerber refused to advance Logfret any additional funds, but "continue[d] to impose and charge over-advance and other fees to Logfret under the [Loan] Agreement."  *Id.* ¶ 66.  And Gerber continued to charge Logfret interest on the loan balance.  *Id.* ¶ 67.  Further, Gerber has told Logfret that Logfret is required to pay "hundreds of thousands of dollars in 'exit fees' for an early termination of the [Loan] Agreement" and must release Gerber from all possible claims before

Gerber will return Logfret's collateral.  *Id.* ¶ 68.[2]

Gerber has retained a collections firm called Paul Rome and Associates, LLC ("Paul Rome"), which Logfret describes as Gerber's "hit man."  *Id.* ¶¶ 70, 73 (internal quotation marks omitted).  Paul Rome has contacted Logfret's customers "demanding" that they direct all amounts that they owe Logfret, including customs fees, into the collateral account.  *Id.* ¶ 72.  This collection effort is apparently done in an effort to obtain funds to pay off the amounts that Logfret owes to Gerber.  *See id.* ¶ 70.  The notifications that Paul Rome has sent Logfret's customers "threaten[]" that failure to comply with Paul Rome's directives could subject the customers themselves to liability, but the notices do not state why Paul Rome has authority to contact them.  *Id.* ¶ 72.  These actions have created "anxiety, confusion, and angst among Logfret's customers," which Logfret says has jeopardized its relationships with its customers.  *Id.* ¶ 73.

Logfret requested from Gerber an accounting of all the fees and penalties that Gerber charged, but Gerber did not provide this.  *Id.* ¶ 75.  Regardless, Logfret says that from the closing date of the Loan Agreement through September 1, 2020, Gerber imposed the following: (1) over-advance fees (imposed at a rate of 2.5% per month) in the amount of $222,042.72 and (2) diversion fees (imposed at a rate of 15%) in the amount of $500,949.61.  *Id.* ¶ 76.  The fees imposed therefore total $722,992.33, but there apparently were other costs charged to Logfret as well, such as Gerber's attorneys' fees and interest on the loan.  *Id.*

As of September 1, 2020, Logfret's loan balance was $21,071.60, and Gerber had deducted the $722,992.33 in over-advance and diversion fees from Logfret's collateral account.  *Id.* ¶ 77.

**B.  Procedural History**

Logfret initiated this action on September 2, 2020 with the filing of the Complaint.  Logfret

---

[2] Logfret points to these exit fees several times throughout the Complaint, but it appears that such fees may not have yet been assessed on Logfret.  *See, e.g.*, Compl. ¶ 76.

asserts ten causes of action against Gerber.  *Id.* ¶¶ 79-131.

First, Logfret seeks a declaratory judgment that the 2.5% over-advance fee is usurious under New York law because it amounts to a 30% fee annually.  *Id.* ¶ 80.  Further, Logfret alleges that the diversion fee and early termination fee were impermissible penalties under New York law and are thus unenforceable.  *Id.* ¶¶ 84, 86.  Second, Logfret alleges that Gerber breached the Loan Agreement by violating its "terms and spirit."  *Id.* ¶ 88.  Specifically, Logfret says that Gerber's charging of fees and preventing the customs fees from leaving the collateral account amounted to breach.  *Id.*  Third, Gerber breached the covenant of good faith and fair dealing, Logfret says, when it failed to "abide by the numerous representations and assurances" Gerber made during the negotiation phase.  *Id.* ¶ 92.  Fourth, Logfret alleges that Gerber breached "its fiduciary duties of trust and confidence by violating various laws and the [Loan] Agreement."  *Id.* ¶ 96.  Logfret also brings a claim for tortious interference with current and prospective economic relations, alleging that Gerber did this by "imposing the impermissible and illegal fees and penalties upon Logfret and thereby restricting Logfret's ability to meet its contractual obligations to its customers" and preventing withdrawal of Logfret's customers' customs fees.  *Id.* ¶ 100.

Logfret also asserts claims for fraud in the inducement, misrepresentation, and promissory estoppel, alleging that it was tricked by Gerber's extra-contractual representations that it would "work with Logfret and not impose any fees during at least the first 90 days of the [l]oan."  *Id.* ¶¶ 104, 110, 116.  Finally, for its ninth and tenth claims, Logfret demands an accounting "as to the basis of all fees charged and how all fees have been calculated," *id.* ¶ 121, and demands that the Court order equitable relief in the form of rescinding the Loan Agreement and returning the parties back to the "status quo," *id.* ¶ 130.

As for remedies, Logfret demands at least $722,992.33 as reimbursement for the over-

advance fees and diversion fees, as well as any interest charged on those fees, and punitive damages. *Id.* at 27.  Further, Logfret seeks a declaration that Gerber breached the Loan Agreement through its assessment of fees and penalties, a declaration that the Loan Agreement is rescinded, and various other forms of equitable relief.  *Id.* at 27-28.

This case was reassigned to the undersigned on September 29, 2020.  On November 30, 2020, Gerber filed a motion to dismiss to dismiss the Complaint pursuant to Rule 12(b)(6), Dkt. 20, and a memorandum of law in support of its motion, Dkt. 21 ("Motion").  Logfret filed an opposition brief on December 21, 2020.  Dkt. 22 ("Opposition").[3]  Gerber filed a reply brief on January 11, 2021.  Dkt. 23 ("Reply).

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  In other words, the plaintiff must allege facts that "nudge[] [its] claim[]

---

[3] Logfret's twenty-five page Opposition uses 11-point type.  This is a violation of Local Civil Rule 11.1(b), which requires that text in motion papers be "12-point type or larger."  This appears to be an attempt to circumvent 2.B of the Court's Individual Rules and Practices in Civil Cases, which states that memorandum of law in opposition to motions are limited to twenty-five pages, unless the Court grants permission to file a longer brief.  Logfret never asked the Court for a page extension for its Opposition.  "A district court has discretion in deciding whether to strike a submission not in compliance with a local rule."  *Guity v. Uniondale Union Free Sch. Dist.*, No. 15 Civ. 5693 (SJF) (AKT), 2017 WL 9485647, at *6 (E.D.N.Y. Feb. 23, 2017) (internal quotation marks omitted).  The Court will not strike Logfret' Opposition here and instead waives compliance with Local Civil Rule 11.1(b).  But the Court respectfully reminds counsel to adhere to all Local Rules when making future submissions in this District.

across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro*, 807 F.3d at 544, it need not "accept as true legal conclusions couched as factual allegations," *Lafaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## III. Discussion

Although Logfret lodges ten separate causes of action against Gerber, the gist of the Complaint is relatively simple.  Logfret's primary gripe is that Gerber charged it hundreds of thousands of dollars' worth of fees under the terms of the Loan Agreement, and Logfret thinks this was not right.  Logfret does not allege that the Loan Agreement did not allow for these fees or that the circumstances at issue did not warrant the assessment of such fees.  In fact, on the first page of its Opposition, Logfret admits that Gerber "may have been permitted to impose upon Logfret certain . . . fees under the [Loan] Agreement."  Opposition at 1.  And Logfret goes on to concede that "the [Loan] Agreement permitted over-advance fees and diversion [fees]." *Id.* at 12.  Instead, Logfret attempts to get out from under the very fees to which it assented in the Loan Agreement by looking to New York usury laws and also arguing that certain ones amounted to unenforceable penalties prohibited by law.  Further, Logfret says that it was duped by various extra-contractual representations from Gerber, despite the fact that the heavily-lawyered Loan Agreement did not include such representations.  Finally, Logfret also takes issue with Gerber's treatment of certain funds that were designated to be paid as customs fees and deposited into the collateral account.[4]

The Court takes each cause of action in turn, but, for the reasons stated below, Logfret fails

---

[4] Pursuant to New York choice-of-law rules, New York law applies because "[t]he parties' briefs assume that New York law controls." *Response Pers., Inc. v. Hartford Fire Ins. Co.*, 812 F. Supp. 2d 309, 314 (S.D.N.Y. 2011); *accord Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

to plead a plausible claim for relief with regard to any of the ten claims.  The Court thus grants Gerber's motion and dismisses the Complaint.

## A.  Declaratory Judgment

Logfret first seeks a declaratory judgment that the over-advance fee of 2.5% per month is usurious under New York law.  Compl. ¶¶ 80, 86.  "[T]he usury laws are expressly inapplicable where the sum involved is equal to or greater than $2.5 million."  *NML Cap. v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010); *accord* N.Y. Gen. Oblig. Law § 5-501(6)(b) ("No law regulating the maximum rate of interest which may be charged, taken or received . . . shall apply to any loan or forbearance in the amount of two million five hundred thousand dollars or more.").  Here, the Loan Agreement had a maximum revolving credit line of $3 million, and Logfret took out a $2,746,930.42 loan immediately after the Loan Agreement closed.  *See* Compl. ¶¶ 12, 15.  Because the loan here was for a sum greater than $2.5 million, New York usury laws do not apply, *NML Cap.*, 621 F.3d at 238, and Logfret's request for a declaratory judgment that the over-advance fees charged with regard to this loan were usurious fails.

Logfret's arguments to the contrary are unavailing.  It concedes that the loan surpassed the $2.5 million threshold, but says that it went over this threshold only "one time."  Opposition at 2. Logfret seems to think this somehow matters, but it does not (especially when it appears that Gerber gave Logfret only one loan).  The law is clear that New York usury laws do not apply to any loan of that size.  *See* N.Y. Gen. Oblig. Law § 5-501(6)(b).  Further, Logfret argues that the Loan Agreement was drafted with a $3 million maximum credit line in order to "circumvent the usury laws."  Opposition at 2.  Again, the Court struggles to see why this is relevant.  Logfret and Gerber are two sophisticated corporate entities and were represented by competent counsel in drafting the more than 100 pages that constitute the Loan Agreement.  The Court is aware of no

authority, and Logfret cites none, that prevents parties from purposefully entering into a transaction that will not be subjected to New York usury laws. And further, Logfret's focus on the $3 million maximum revolving credit line is puzzling when an equally important point is that the one loan that Logfret drew on this credit line also exceeded the $2.5 million threshold. Logfret's arguments fail, and the Court concludes that the over-advance fees in the Loan Agreement are not subject to New York usury laws.

Second, Logfret requests a declaratory judgment that the diversion fees and exit fees constituted illegal penalties under New York law. Compl. ¶¶ 81-86. "Under New York law, courts will uphold and enforce liquidated damages provisions where (1) actual damages are difficult to determine and (2) the amount of damages awarded pursuant to the clause is not clearly disproportionate to the potential loss." *Union Cap. LLC v. Vape Holdings Inc.*, No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *7 (S.D.N.Y. Mar. 31, 2017); *accord Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424-25 (1977). "The party seeking to avoid imposition of the liquidated damages provision . . . bears the burden of proving that the clause operates as a penalty." *Union Cap. LLC*, 2017 WL 1406278, at *7. In determining whether a liquidated damages provision functions as a penalty, the Court considers "whether damages were ascertainable and the liquidated damages amount was unreasonable as of the time of contracting, not the time of the breach" and "must also consider the sophistication of the parties and whether they were represented by counsel." *Id.*

Logfret fails to carry its burden here. The Complaint does not plead any facts alleging that damages captured by any of the fees in the Loan Agreement were ascertainable at the time of contracting. Nor does it allege that any were disproportionate to the potential losses when the contract was drafted. Logfret instead focuses on whether Gerber has actually suffered damages

due to Logfret's conduct since the closing of the Loan Agreement.  *See* Compl. ¶ 84 (alleging that

"Gerber has not suffered any loss as a result of any alleged diversion, nor of any early termination

of the [Loan] Agreement term, and even if it had, the amount of loss (as could have been

contemplated at the time the parties entered into the [Loan] Agreement) is wholly disproportionate

to the penalty charged or proposed to be charged and Gerber cannot show otherwise"); Opposition

at 3 (same).  These pleading deficiencies are fatal to Logfret's claim and confuse the relevant

analysis.  The question is not whether Gerber suffered damages when Logfret took a loan higher

than the maximum amount allowed by the Loan Agreement or failed to deposit certain collateral

into the collateral account, but rather whether the amount of such damages was "ascertainable . . .

as of the time of contracting" the Loan Agreement.  *Union Cap. LLC*, 2017 WL 1406278, at *7.

Logfret pleads no facts suggesting that it was.

Logfret also repeatedly emphasizes that in one e-mail, Goynatsky described the diversion

fee as a "huge penalty," and that this therefore must mean the fee is an unenforceable penalty.

Compl. ¶ 85 (internal quotation marks omitted); *see also* Opposition at 4; Compl., Exh. D.  But

colloquial labels are irrelevant to the analysis.  *Truck Rent-A-Ctr., Inc.*, 41 N.Y.2d at 425 ("In

interpreting a provision fixing damages, it is not material whether the parties themselves have

chosen to call the provision one for 'liquidated damages,' . . . or have styled it as a penalty.").

In all events, the fees at issue here (an over-advance fee of 2.5% and a diversion fee of

15%) do not appear to be unreasonable.  These amounts—which were "the product of an arms-

length transaction between sophisticated business[persons], ably represented by counsel"—do not

appear to be "plainly disproportionate to the possible loss."  *Walter E. Heller & Co. v. Am. Flyers*

*Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972); *accord JMD Holding Corp. v. Cong. Fin. Corp.*,

4 N.Y.3d 373, 382-83 (2005).  Logfret's conclusory allegations to the contrary are insufficient to

survive Gerber's motion to dismiss.  *See, e.g.*, Compl. ¶ 69 (alleging that the exit fees "constitute unlawful penalties that are not enforceable and void as a matter of law").

For the first time in its Opposition, Logfret seems to argue that Gerber's utilization of the collateral account "to create a reserve for the indemnification of legal expenses" also amounted to an impermissible penalty (or possibly a breach of the Loan Agreement).  Opposition at 6-7.  Gerber cites paragraph 76 of the Complaint for support of this theory, but that paragraph only baldly asserts that Gerber had assessed and drawn "Gerber's attorneys' fees" from the collateral account.  Compl. ¶ 76.  The Complaint pleads no facts about anything related to a "reserve" for such expenses, and did not rely on such an argument for support of its declaratory judgment claim.  *See id.* ¶¶ 79-86.  "The Court declines to take these assertions into account because '[n]ew facts and allegations, first raised in a Plaintiff's opposition papers, may not be considered' in deciding a motion to dismiss."  *Universal Trading & Inv. Co. v. Tymoshenko*, No. 11 Civ. 7877 (PAC), 2012 WL 6186471, at *1 (S.D.N.Y. Dec. 12, 2012) (*Simone v. United States*, No. 09 Civ. 3904 (TCP), 2012 WL 4891617, at *6 (E.D.N.Y. Oct. 9, 2012)).

In sum, because the Court concludes that New York usury laws do not apply to the Loan Agreement, and Logfret has failed to show that the fees to which it agreed in the Loan Agreement are unenforceable penalties, the Court dismisses Logfret's declaratory judgment claim (first claim).

## B.  Breach of Contract

Not once does the Complaint identify a single provision of the Loan Agreement that Gerber breached.  "A breach of contract claim will be dismissed . . . as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, including the specific provision of the contract upon which liability is

predicated." *Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) (quoting *Highlands Ins. Co. v. PRG Brokerage, Inc.*, No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004)).

Instead, much of Logfret's breach of contract claim appears to be grounded in the representations that Goynatsky and other Gerber representatives made in e-mails or other communications during the negotiation of the Loan Agreement. *See* Compl. ¶¶ 16, 22-32; Opposition at 8-9 (discussing "Gerber's breach of its representations and promises"). Reliance on these extra-contractual statements is entirely misplaced because the Loan Agreement included a merger clause. *See* Loan Agreement § 13.18. This provision made clear that there were "no promises, undertakings, representations or warranties" by either party regarding the Loan Agreement that were not "expressly set forth or referred to herein" or included in other materials related to the Loan Agreement. *Id.* Pre-contractual representations about fees that were not included in the Loan Agreement are thus no matter. *See DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.*, No. 03 Civ. 3654 (GBD), 2005 WL 425495, at *3 (S.D.N.Y. Feb. 18, 2005) ("Where the parties' agreement is clearly set forth in a written document, a determination of the parties' contractual obligations and rights are generally to be determined by examination solely of the written agreement."). A merger clause like the one included in the Loan Agreement prevents "the introduction of extrinsic evidence to alter, vary, or contradict the terms of the writing." *Id.* Logfret could have attempted to negotiate the inclusion of provisions in the Loan Agreement memorializing the representations made during negotiations (such as a provision stating that Gerber would not impose any fees during the first three months of any loan), but it did not. Logfret cannot now argue Gerber breached a provision of the Loan Agreement that simply does not exist.

Nor is Logfret's focus on representations made post-closing helpful in its attempt to plead

a breach of contract claim. *See* Compl. ¶¶ 36-37. The Loan Agreement provided that any amendments to the Loan Agreement were required to be "in writing and signed by [Gerber]." Loan Agreement § 13.2. Logfret does not allege that this occurred, but instead only asserts that at one point "Gerber advised Logfret" that the over-advance fees and diversion fees "would be credited back to Logfret." Compl. ¶ 36. Vaguely asserting that Gerber made a post-contractual representation that conflicted with provisions in the Loan Agreement does not plausibly form the basis for Logfret's breach of contract claim.

Besides pointing to extra-contractual communications, and rather than identifying a specific provision of the Loan Agreement that Gerber breached, Logfret instead generally pleads that Gerber violated the "terms and spirit" of the Loan Agreement. *Id.* ¶ 88. Specifically, Logfret says Gerber breached the Loan Agreement by: (1) "impermissibly charging and collecting unenforceable over-advance fees"; (2) "illegally imposing and collecting unenforceable diversion penalty fees"; and (3) "retaining and seizing customs[] fees belonging to Gerber's customers in contravention of the [Loan] Agreement." *Id.* The Court addresses each of these contentions in turn.

With regard to the over-advance fees, Logfret does not allege that Gerber breached the Loan Agreement because the Loan Agreement did not provide for these fees or that Gerber's assessment of them was improper because Logfret did not exceed its borrowing limit. Instead, Logfret just reiterates its argument that the over-advance fees amount to usury under New York law. *See* Opposition at 12 (arguing that Logfret pleads a breach of contract claim because the "over-advance fees . . . were and are usurious"). Logfret argues the same with regard to the exit fees. *See id.* The Court is unpersuaded by Logfret's usury argument for the same reasons it rejects this argument with regard to Logfret's declaratory judgment claim.

Similarly, as for the diversion fees, Logfret repeats its argument that this type of fee and the

exit fee are unenforceable penalties under New York law.  *See* Opposition at 12 (arguing that Logfret pleads a breach of contract claim because the "the diversion penalties of 15% and the termination fee are unenforceable").  The Court again rejects this argument for the same reasons as previously stated.  Further, Logfret concedes that the Loan Agreement provided for diversion fees, but seems to think they should not apply because the discussion of diversion fees appeared in a different section of the Loan Agreement than other fees, and diversion fees were mentioned "in just one line" of the more than one-hundred page Loan Agreement.  Compl. ¶ 50.  This argument surely fails because the Loan Agreement, negotiated by sophisticated parties represented by counsel, made clear that all provisions in the document together constituted the Loan Agreement.  *See* Loan Agreement § 1.4 ("All Schedules, Addenda and Exhibits hereto or expressly identified to this Agreement are incorporated herein by reference and taken together with this Agreement constitute but a single agreement.").  Finally, Logfret does not argue that it complied with the collateral provisions such that Gerber never should have charged the diversion fees.  It only focuses on how it *attempted* to come into compliance with the collateral requirements after it had already failed to abide by the provisions of the Loan Agreement.  *See* Compl. ¶¶ 34-35, 39.  These arguments fail.

However, Logfret also pleads facts suggesting that Gerber assessed some of the diversion fees because Logfret failed to "immediately" deposit certain funds into the collateral account. Compl. ¶ 52 (internal quotation marks omitted); *see also id.* ¶¶ 53-54; Opposition at 11.  Under Schedule IV of the Loan Agreement, if a Logfret customer did not pay funds it owed Logfret into the collateral account and instead directly paid Logfret the money, and Logfret then did not "immediately deposit" such funds into the collateral account, Gerber could assess a diversion fee. *See* Loan Agreement, Schedule IV.  Logfret alleges that the Loan Agreement did not define the term "immediately," but that Gerber "took it upon itself to unilaterally declare 'immediately'"

meant "within 24 hours of Logfret's receipt" of the funds.  Compl. ¶ 53.

Logfret contends that Gerber impermissibly charged "many" of the diversion fees despite the fact that Logfret could not immediately deposit the funds due to factors "outside of Logfret's control."  Compl. ¶ 54.  For example, Logfret cites "bank wire delays" and "COVID" as general causes of the delays.  *Id.*  Vague allegations like these do not plead a plausible breach of contract claim.  For example, the Complaint does not make clear which diversion fees were assessed only because of depository delays that were out of Logfret's control.  Nor does it identify the specific issues Logfret faced with regard to each delay.  The Court is unpersuaded that generally relying on "COVID" and nondescript wire delays suffices.  Further, Logfret does not allege anything specific about the circumstances surrounding these delays, such as the length of the delays caused by outside factors or how and when Logfret came into compliance with its obligations under Schedule IV.  In short, the alleged facts do not plead a plausible claim that Gerber breached the Loan Agreement by assessing diversion fees in this manner.

However, sufficiently pleaded, this claim could have legs.  To put it differently, Logfret appears to argue that it deposited the necessary funds "immediately," or at least as "immediately" as circumstances permitted, and thus it complied with Schedule IV of the Loan Agreement and, therefore, Gerber should not have assessed at least some of the diversion fees.  The Court will therefore dismiss without prejudice Logfret's breach of contract claim with regard to its theory that Gerber impermissibly assessed certain diversion fees despite Logfret's attempt immediately to transfer the relevant funds into the collateral account.

Finally, the Court addresses whether Logfret has pleaded a breach of contract claim based on Gerber's "retaining and seizing customs[] fees belonging to Gerber's customers in contravention of the [Loan] Agreement."  Compl. ¶ 88.  This fails.  Logfret does not allege that the Loan

Agreement provided that customs fees would be treated differently than other funds Logfret received from its customers, or that funds earmarked for customs fees should have never been deposited in the collateral account.  The Loan Agreement broadly provided that "all . . . property and assets" belonging to Logfret constituted collateral.  Loan Agreement § 10.1(a).  Logfret concedes that its customers deposited the funds directly into the collateral account, Compl. ¶ 56, and does not plead facts to suggest that Gerber was obligated to treat such funds differently than any other amounts or assets deposited into that account.

The Court thus dismisses Logfret's claim for breach of contract (second claim).  However, the Court dismisses without prejudice the portion of this claim that relies on the theory that Gerber breached the Loan Agreement by assessing certain diversion fees due to Logfret's failure to "immediately deposit" certain payments into the collateral account.

## C.  Breach of the Implied Covenant of Good Faith and Fair Dealing

"New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002).  Logfret maintains that its allegations of breach of the implied covenant of good faith and fair dealing are not based upon the same facts as its breach of contract claim because it focuses on representations made by Gerber during negotiations. *See* Compl. ¶ 92; Opposition 14-15.  But Gerber heavily relies on these same arguments for its breach of contract claim. *See* Opposition at 9.  The Court concludes that both claims deal with the same facts—*i.e.*, whether Gerber is liable to Logfret for the representations it made about the fees and, more generally, whether Gerber acted properly pursuant to the Loan Agreement—and thus Logfret's claim for breach of the implied covenant of good faith and fair dealing is duplicative.  The Court thus dismisses Logfret's third claim.

### D.  Breach of Fiduciary Duty

Logfret's fourth claim, breach of fiduciary duty, is also duplicative of its breach of contract claim.  "'Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract' and must be dismissed." *Uni-World Cap., L.P. v. Preferred Fragrance, Inc.*, 43 F. Supp. 3d 236, 244 (S.D.N.Y. 2014) (quoting *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publ'g Co.*, 580 F. Supp. 2d 285, 294-95 (S.D.N.Y. 2008)).  Logfret's claim here thus cannot stand because "[b]oth claims are premised upon the same facts and seek the same damages for the alleged conduct." *Id.* (quoting *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 106 (S.D.N.Y. 2013)); *see* Opposition at 15 (relying on the Loan Agreement in support of Logfret's breach of fiduciary duty claim).  Still, Logfret argues that the parties here had a fiduciary relationship because Gerber controlled Logfret's collateral account.  Opposition at 15-16.  A debtor and creditor relationship is typically insufficient to establish a fiduciary duty, but in "unusual circumstances" one may arise if there is sufficient "assumption of control and responsibility." *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 318 (2d Cir. 1993).  Logfret has not alleged facts that suggest this "unusual circumstance[]," *id.*, existed here.  And the fact that Gerber controlled the collateral account pursuant to the terms of the Loan Agreement is insufficient to demonstrate this. *See RMP Cap. Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 185-86 (E.D.N.Y. 2014).

Logfret's "breach of fiduciary duty claim is identical in substance to the breach of contract claim and is therefore duplicative," *Uni-World Cap., L.P.*, 43 F. Supp. 3d at 244 (internal quotation marks omitted), and, regardless, Logfret has not pleaded sufficient facts to suggest that Gerber had a fiduciary duty to Logfret as a result of their creditor/debtor relationship.  The Court thus dismisses Logfret's claim for breach of fiduciary duty (fourth claim).

**E.  Tortious Interference with Current and Prospective Economic Relations**

Logfret's claim for tortious interference with current and prospective economic relations similarly fails as duplicative.  "As a general rule, tortious interference claims that are duplicative of contract claims are precluded."  *Choquette v. Motor Info. Sys., Inc.*, No. 15 Civ. 9338 (VEC), 2017 WL 3309730, at *6 (S.D.N.Y. Aug. 2, 2017); *accord Utiz v. Lustigman Firm, P.C.*, No. 13 Civ. 6040 (RMB), 2014 WL 3767056, at *2 (S.D.N.Y. July 28, 2014).  In the Complaint, Logfret says that Gerber tortiously interfered with Logfret's customers by "among other things, imposing the impermissible and illegal fees and penalties upon Logfret."  Compl. ¶ 100.  Because these allegations mirror Logfret's breach of contract claim, the claim fails as duplicative.

In its Opposition, Logfret shifts gears and attempts to argue that the claim is also grounded in Paul Rome's contact with Logfret's customers.  Opposition at 16-17.  Logfret did not rely on this in its Complaint but, even if it had, it would fail as insufficiently pleaded.  Under New York law, the elements of a claim for tortious interference with business relations are: "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).  Logfret fails to make a plausible showing that Gerber asked Paul Rome to reach out to Logfret's customers for a "wrongful purpose."  Further, it is not plausible that Paul Rome contacted Logfret's customers using "dishonest, unfair, or improper means" when the Loan Agreement itself contemplated the very contact that Paul Rome made.  *See* Loan Agreement § 10.2(a) ("Lender may . . . communicate with Account Debtors . . . and . . . at any time following the occurrence and during the continuation of an Event of Default, notify Account Debtors . . . that the Collateral has been assigned to Lender and that payments shall be made directly to Lender.").

The Court dismisses this claim (fifth claim) as well.

**F. Fraud in the Inducement, Misrepresentation, and Promissory Estoppel**

Fraud in the inducement must be pleaded with "particularity" pursuant to Rule 9(b) of the Federal Rules of Civil Procedure.  This means that the Complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  The elements of a claim for fraud in the inducement under New York law are: (1) "a material misrepresentation or omission of fact"; (2) "made by defendant with knowledge of its falsity"; (3) "intent to defraud"; (4) "reasonable reliance on the part of the plaintiff"; and (5) "resulting damage to the plaintiff." *CapLOC, LLC v. McCord*, No. 17 Civ. 5788 (AT), 2018 WL 3407708, at *9 (S.D.N.Y. June 12, 2018).

The Loan Agreement provided that Gerber could charge the relevant fees and did not state anything about a period of time during which fees would not be assessed.  Even though Logfret alleges that Gerber representatives promised a grace period for fees before closing, it was not reasonable for Logfret to rely on pre-contractual representations when they were contradicted by the Loan Agreement, which included a merger clause.  "A party's reliance is not reasonable where it is directly contradicted by a contractual provision." *Id.* at *10 (collecting cases).

Logfret also vaguely refers to various "representations and assurances" by Gerber following the signing of the Loan Agreement.  *See* Compl. ¶ 37; *see also id.* ¶¶ 36-38.  None of these allegations satisfy the Rule 9(b) pleading standard because Logfret fails to plead facts specifying the exact statements or providing details about them, such as the identity of the speaker or the date of the statements.  *See Rombach*, 355 F.3d at 170.  Further, reliance on such representations would not be reasonable for a sophisticated party like Logfret when the Loan Agreement specifically

provided how the Loan Agreement could be amended.  *See* Loan Agreement § 13.2.  Logfret thus does not plausibly plead a fraud in the inducement claim.

The Court assumes Logfret's claim for "misrepresentation" is one for intentional misrepresentation.  *See* Compl. ¶ 112 (alleging that "Gerber knew when the representations were made, that they were either false or were made recklessly without knowledge or regard of their truth").  "Under New York law, 'a claim for intentional misrepresentation . . . is identical to a claim for fraud.'"  *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 500 (S.D.N.Y. 2020) (quoting *Assoun v. Assoun*, No. 14 Civ. 1368 (PAC), 2015 WL 110106, at *5 (S.D.N.Y. Jan. 7, 2015)).  Because this claim also requires "justifiable reliance by the plaintiff," *id.*, it fails for the same reason as Logfret's fraud in the inducement claim.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) ("Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation.").

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear an unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of that reliance."  *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).  Logfret's promissory estoppel claim likewise fails because Logfret fails to plead reasonable reliance on any of Gerber's promises.  The Loan Agreement outlined the parties' entire agreement, and it would have been unreasonable for Logfret to rely on representations from Gerber representatives that were not included in the Loan Agreement.  *See DDCLAB Ltd.*, 2005 WL 425495, at *6.

The Court thus dismisses Logfret's claims for fraud in the inducement (sixth claim), misrepresentation (seventh claim), and promissory estoppel (eighth claim).

## G. Demand for Accounting

Logfret's demand for an accounting is also duplicative of its breach of contract claim. *See Physicians Mut. Ins. Co. v. Greystone Servicing Corp.*, No. 07 Civ. 10490 (NRB), 2009 WL 855648, at *11 (S.D.N.Y. Mar. 25, 2009) (dismissing an accounting claim because it arose from the "same operative facts as plaintiffs' contract breach claim").   Regardless, Logfret fails sufficiently to plead this claim because, as discussed above, the Complaint does not plausibly allege a fiduciary relationship, which is a required element of this claim. *See Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018) (explaining that the four elements for a claim for equitable accounting under New York law are: "(1) a fiduciary relationship (2) entrustment of money or property (3) no other remedy and (4) a demand and refusal of an accounting.").   The Court thus dismisses Logfret's demand for an accounting (ninth claim).

## H. Demand for Recission

The Court also dismisses Logfret's tenth cause of action for recission of the Loan Agreement.  First, the Court questions whether this is even properly pleaded as a standalone claim rather than a remedy.  *See* Compl. ¶ 126 (seeking recession of the Loan Agreement due to Gerber's alleged breach of the Loan Agreement).  But regardless, even as a remedy, it is an "extraordinary" one and "appropriate only when the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Krumme*, 238 F.3d at 143 (quoting *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir. 1980)).  Logfret has failed to plead facts suggesting that this "extraordinary" remedy would be warranted here because monetary damages would not suffice.  But regardless, because the Court dismisses Logfret's breach of contract claim, it also dismisses Logfret's demand for recission of that contract (tenth claim).

### IV.  Conclusion

For the reasons stated, the Court grants Gerber's motion to dismiss in its entirety.  All of Logfret's claims are dismissed with prejudice, except for Logfret's breach of contract claim based on the theory that Gerber breached the Loan Agreement by assessing certain diversion fees due to Logfret's failure to "immediately deposit" certain payments into the collateral account, which is dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 20 and close this case.

SO ORDERED.

Dated: September 10, 2021
      New York, New York

                                    JOHN P. CRONAN
                              United States District Judge